UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

WORCESTER, ss.

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | Case No. 23-40709-CJP |
| WESTBOROUGH SPE LLC, | ) |  |
|  | ) |  |
|  | ) |  |
| LOLONYON AKOUETE, | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
| v. | ) | Adversary Proceeding |
|  | ) | No. 24-04017-CJP |
| JONATHAN GOLDSMITH, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## PLAINTIFF'S MOTION FOR EXPEDITED DETERMINATION AND RENEWED MOTION FOR DECLARATORY JUDGMENT

Plaintiff Lolonyon Akouete respectfully moves this Court for (i) expedited

determination and (ii) entry of a declaratory judgment resolving the issue of

managerial authority of Westborough SPE LLC. In support, Plaintiff states as

follows:

## I. INTRODUCTION

This adversary proceeding presents a narrow but foundational issue: who holds

managerial authority under the governing Limited Liability Company Agreement.

Plaintiff commenced this action on April 15, 2024, seeking a declaratory

determination of that question. More than two years later, that issue remains

unresolved.

The Court previously stayed this proceeding on the ground that the issue of managerial authority was "not presently relevant" and could be addressed through the claim allowance process. That premise has now proven incorrect. The claim allowance process has concluded, but it did not resolve the issue of authority. Instead, it resulted in a contested summary judgment ruling that is now the subject of multiple pending appeals, including an appeal challenging the merits determination and a separate appeal challenging the denial of critical discovery.

Those appeals arise from a record that Plaintiff contends was materially incomplete due to discovery limitations and misconduct, including the failure to produce evidence directly bearing on authority, governance, and control. As a result, the very process that was intended to promote judicial economy has instead produced fragmented litigation across multiple forums, without resolving the core contractual issue presented here.

At the same time, this adversary proceeding—filed specifically to resolve managerial authority—has remained stayed for over two years. That delay is inconsistent with the governing legal framework. Under Delaware law, disputes concerning the identity and authority of a manager are intended to be resolved promptly and efficiently, precisely because uncertainty in control undermines the stability of the entity and the validity of its actions.

The issue is now indisputably ripe. The claim objection process has run its course and is on appeal; it no longer provides a basis to defer adjudication. Continued delay

risks prejudice, inefficiency, and inconsistent rulings, particularly where questions of authority, delegation, and the validity of prior acts remain unresolved.

Accordingly, Plaintiff respectfully requests that the Court lift the stay for the limited purpose of resolving this discrete issue and grant expedited determination of the renewed request for declaratory relief.

## II. BASIS FOR EXPEDITED DETERMINATION

Expedited determination is warranted because this motion presents a discrete, contract-based issue that is fully ripe for adjudication and does not require further factual development. The question of managerial authority turns entirely on the interpretation and application of the governing Limited Liability Company Agreement, the relevant provisions of which are already before the Court. Delaware law is clear that an LLC agreement is the primary source of authority governing the internal affairs of the entity, and where the agreement speaks, it controls. See In re Coinmint, LLC. Accordingly, resolution of this issue is a matter of law appropriate for prompt determination.

Expedited consideration is further justified because the dispute has immediate and continuing consequences across multiple proceedings. The issue of managerial authority bears directly on questions of standing, the scope of delegated authority, and the validity of actions taken on behalf of the Debtor. Those issues are not confined to this adversary proceeding but extend to related litigation, including

matters currently on appeal. Without a definitive determination of authority, those proceedings risk being litigated on an uncertain or incomplete legal foundation.

Delay would also perpetuate precisely the type of uncertainty that Delaware law seeks to avoid. Actions concerning the identity and authority of a manager are intended to be resolved quickly in order to ensure clarity in governance and to prevent ongoing disputes over control. See Llamas v. Titus (noting that proceedings under Section 18-110 are designed to "expeditiously resolve uncertainty" regarding managerial control). Here, however, the issue has remained unresolved for more than two years despite the existence of a dedicated adversary proceeding brought for that purpose.

Finally, the prior basis for deferring this issue—namely, that it could be addressed through the claim allowance process—no longer applies. That process has concluded and is now the subject of appellate review, and it did not resolve the contractual question presented here. In these circumstances, expedited determination is necessary to bring clarity to a core governance issue that remains outstanding and continues to affect the administration of related rights and proceedings.

### III. THE LLC AGREEMENT CONTROLS AS A MATTER OF LAW

Under Delaware law, a limited liability company is governed first and foremost by its limited liability company agreement. The Delaware Supreme Court has described the Delaware LLC Act as fundamentally contractarian and has held that its policy is

"to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." Elf Atochem N. Am., Inc. v. Jaffari, 727 A.2d 286, 291–92 (Del. 1999). As Elf Atochem explains, the "basic approach" of the Act is to give members broad discretion to define their rights and obligations by agreement, while the statute supplies default rules only where the agreement is silent.

That principle has been repeatedly reaffirmed. The Court of Chancery has held that the LLC agreement "serves as the primary source of rules governing the affairs of a limited liability company and the conduct of its business." In re Coinmint, LLC, 261 A.3d 867, 889–90 (Del. Ch. 2021). The Delaware Supreme Court likewise has made clear that, if the LLC agreement addresses the issue, "the agreement controls unless it violates one of the LLC Act's mandatory provisions," and only if the agreement is silent does the court look to the Act's default rules. Holifield v. XRI Inv. Hldgs. LLC, 304 A.3d 896, 923 (Del. 2023). The same formulation appears in the authorities Plaintiff provided from Sybil Potts v. SYFS Intermediate Holdings, LLC, which reiterates that Delaware LLC law enforces the operating agreement as a contract and uses the statute only as a gap-filler where the agreement does not speak.

This matters because the Court's task is not to begin with abstract statutory possibilities and then work backward to the contract. Delaware law requires the opposite approach. "All considerations of an LLC's internal governance commence by examining the LLC agreement." Hassanein v. NTO Fund I, LLC (quoting

Coinmint and Holifield). That is so because the LLC is a "creature of contract," and the parties' bargain—not a free-floating set of default assumptions—defines the company's governance structure, rights, and limitations.

Delaware law is equally clear that default rules cannot be used to override contractual provisions that actually address the disputed subject. In Glenn B. Showell v. Pusey, the Court of Chancery rejected reliance on a default statutory provision where the governing agreements addressed the issue and did not authorize the asserted right. The court explained that LLC agreements are contracts whose provisions must be construed as a whole to effectuate the parties' intent, and that default rules are meant to fill gaps, not displace the agreement itself. That reasoning applies here. If the Westborough SPE LLC Agreement addresses the issue before the Court, then the Agreement governs, and recourse to default statutory provisions is improper unless the Agreement is silent.

The same principle also follows from the Delaware courts' general rules of contract interpretation. Delaware adheres to the objective theory of contracts, under which unambiguous contractual language is enforced according to its plain meaning. Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010). A contract is not ambiguous merely because the parties disagree about its meaning. Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992). And the agreement must be read as a whole, giving effect to all provisions rather than rendering any part surplusage. Osborn, 991 A.2d at 1159; Showell (quoting the same

settled rule). Thus, where the agreement sets forth a governance structure, the court

must enforce that structure as written, not dilute it through implication or substitute a

statutory default rule for the parties' actual bargain.

Accordingly, the governing rule in this adversary proceeding is straightforward. The

Westborough SPE LLC Agreement is the primary and controlling source of

authority. The Court must first determine whether the Agreement addresses the

disputed issue. If it does, the Agreement controls. Only if the Agreement is silent

may the Court look to the Delaware LLC Act's default provisions. Because

Delaware law gives maximum effect to the parties' contractual arrangement, the

Agreement controls here as a matter of law.

## IV. MANAGERIAL AUTHORITY IS EXPRESSLY FIXED BY § 1(d) AND § 1(e)

The Westborough SPE LLC Agreement unambiguously establishes both the identity

of the Manager and the exclusive mechanism by which that status may be altered.

Section 1(d) expressly designates Babcock & Brown Administrative Services Inc. as

the Manager of the Company and provides that any change in the number or identity

of Managers may occur only upon "Consent of the Members," defined as the holders

of more than two-thirds of the Percentage Interests. Section 1(e) reinforces that

allocation of authority by vesting in the Manager the "sole and exclusive authority"

to manage the business and affairs of the Company, while eliminating any voting or

approval rights of the Members except where expressly reserved.

Under Delaware law, these provisions are controlling. As the Delaware Supreme Court held in Elf Atochem North America, Inc. v. Jaffari, the LLC Act is designed to give "maximum effect to the principle of freedom of contract," and the operating agreement constitutes the governing framework for the company's internal affairs. Where, as here, the agreement specifies who the manager is and how that status may be changed, those terms must be enforced as written. See also In re Coinmint, LLC (the LLC agreement is the "primary source of rules governing the affairs of a limited liability company"); Holifield v. XRI Investment Holdings LLC (if the agreement covers the issue, it controls unless it violates a mandatory statutory provision).

Delaware law further makes clear that managerial status is not a matter of implication or inference, but of designation pursuant to the LLC agreement. The Act defines a "manager" as a person "named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement." 6 Del. C. § 18-101(12). Consistent with that definition, courts recognize that a manager-managed structure exists only where the agreement expressly vests authority in a manager, and that authority remains fixed unless altered in accordance with the agreement itself. See Metro Storage International LLC v. Harron; Phillips v. Hove.

Here, the Agreement does not merely identify the Manager; it prescribes the exclusive mechanism for any change to that designation—Member Consent. That requirement is not optional or procedural; it is a substantive condition precedent to

any valid alteration of managerial authority. Delaware courts routinely invalidate actions taken without compliance with such express authorization requirements, not because the entity lacks abstract power, but because the required contractual approval was never obtained. See Frantz Manufacturing Co. v. EAC Industries.

There is no evidence in the record that the Members ever provided the required Consent to remove, replace, or otherwise alter the status of Babcock & Brown Administrative Services Inc. as Manager. Absent that consent, the contractual condition for any change in managerial authority was never satisfied. Under Delaware's contractarian framework, that ends the inquiry. The Manager designated in § 1(d) remains the Manager as a matter of law, and any purported change in that status is ineffective.

## V. ANY PURPORTED RESIGNATION IS INVALID AS A MATTER OF LAW

The Westborough SPE LLC Agreement expressly governs the circumstances under which a Manager may resign and eliminates any right of unilateral withdrawal. Section 1(e) provides that "[n]o Manager may resign or retire from, abandon or otherwise terminate its status as a Manager without the Consent of the Members." This language is unambiguous and establishes a clear contractual condition precedent: Member Consent is required for any effective resignation.

Delaware law not only permits such a restriction—it expressly authorizes it. Section 18-602 of the Delaware LLC Act provides that a manager may resign only "in

accordance with a limited liability company agreement" and further states that an LLC agreement may provide that a manager "shall not have the right to resign." 6 Del. C. § 18-602. Section 18-402 likewise reinforces that a manager ceases to be a manager only as provided in the LLC agreement. Read together, these provisions confirm that the existence, timing, and effectiveness of a resignation are matters of contract, not default statutory entitlement.

Delaware courts consistently enforce such contractual limitations and refuse to substitute default statutory provisions where the agreement addresses the issue. In Glenn B. Showell v. Pusey, the Court of Chancery declined to apply a statutory default rule where the governing agreement did not permit the asserted right, emphasizing that default provisions are designed to fill gaps, not override contractual terms. That principle applies with full force here. The Agreement does not merely omit a resignation mechanism—it affirmatively restricts resignation absent Member Consent. As a result, there is no gap for the statute to fill.

Under Delaware's contractarian framework, the question is not whether a resignation might be possible in the abstract, but whether it occurred in the manner required by the governing agreement. See Elf Atochem North America, Inc. v. Jaffari (LLC agreements are enforced according to their terms and control the parties' rights and obligations). Where the agreement imposes a specific condition—here, Member Consent—failure to satisfy that condition renders the purported act ineffective.

There is no evidence that the Members ever provided the Consent required by § 1(e) in connection with any alleged resignation. Nor is there evidence of compliance with the Agreement's notice and governance provisions that would accompany such an action. In the absence of the required consent, the contractual condition precedent to resignation was never satisfied. Accordingly, any purported resignation is legally ineffective, and the Manager's status remained unchanged as a matter of law.

## VI. ANY PURPORTED CHANGE IN GOVERNANCE IS VOID ABSENT COMPLIANCE WITH § 9(b)

The Westborough SPE LLC Agreement establishes a clear and exclusive mechanism for altering the Company's governance structure. Section 9(b) provides that any "change, modification or amendment" of the Agreement must be (i) in writing and (ii) executed by all Members and, where applicable, the Manager. This provision is not merely procedural—it is a substantive limitation on the ability to alter the Company's governance, including any change to managerial authority.

Delaware law requires strict adherence to such contractual amendment provisions. Section 18-302(e) of the Delaware LLC Act provides that an LLC agreement "may be amended only in that manner" specified in the agreement. 6 Del. C. § 18-302(e). This statutory directive reinforces Delaware's broader contractarian principle: where the parties have prescribed the method by which their agreement may be altered, that method is exclusive and must be followed.

Consistent with that principle, Delaware courts invalidate actions that purport to alter governance without compliance with the governing agreement's authorization requirements. In Frantz Manufacturing Co. v. EAC Industries, the Delaware Supreme Court held that corporate actions taken without the required approval are ineffective, not because the entity lacked general power, but because the necessary authorization was never obtained. The same principle applies in the LLC context: the existence of abstract authority to act does not validate actions taken in contravention of the governing agreement.

This distinction is critical. Delaware law recognizes that an entity may possess the theoretical power to undertake structural actions—such as resignation, replacement, merger, or reallocation of authority—but the validity of those actions depends on whether they were carried out in accordance with the contractual and statutory requirements governing their exercise. Where the agreement imposes express conditions—such as written amendment and unanimous or supermajority consent—those conditions must be satisfied for any change in governance to be effective.

Here, there is no evidence that any written amendment satisfying § 9(b) was ever executed. There is no instrument, executed by the Members and the Manager, that modifies the designation of the Manager, alters the allocation of authority, or otherwise restructures the Company's governance. In the absence of such compliance, any purported change—whether characterized as a resignation, substitution, merger effect, or informal transition—fails as a matter of law.

Accordingly, because the Agreement prescribes the exclusive method for altering

governance and that method was not followed, all purported changes to managerial

authority are void and without legal effect.

## VII. DELEGATION OF AUTHORITY UNDER § 1(g) IS EXPRESSLY AUTHORIZED AND LEGALLY BINDING

The Westborough SPE LLC Agreement does not merely permit delegation—it

affirmatively authorizes the Manager to delegate "all or any of its powers or duties"

to "any… person or entity," including Members and other individuals, through a

written instrument. (§ 1(g)). The Agreement further provides that any such delegee

may act "alone or with others" and may "take any action of any type and do anything

and everything which the delegating Manager may be authorized to take or do." Id.

This is an extraordinarily broad grant of delegated authority, and it is enforceable as

written under Delaware law.

Delaware's LLC Act expressly contemplates and validates such arrangements.

Section 18-407 provides that a manager may delegate its rights and powers to "other

persons," including officers, employees, or agents. 6 Del. C. § 18-407. Consistent

with Delaware's contractarian framework, where an LLC agreement expands or

defines the scope of delegation, those provisions govern. See Elf Atochem North

America, Inc. v. Jaffari (giving maximum effect to the enforceability of LLC

agreements); In re Coinmint, LLC (LLC agreement is the primary source of

authority). Thus, the Agreement's authorization of broad delegation must be

enforced according to its terms.

The Agreement goes further and eliminates any basis to challenge acts taken pursuant to such delegation. Section 1(g) provides that any document executed by a duly authorized delegee "shall be binding upon and enforceable against the Company" and "shall be the valid act and deed of the Company." It further provides that "any third party shall be fully protected in relying upon the authority of any such delegee," and that "no third party need look to any other evidence or require joinder or consent of any other party" to establish authority. These provisions are dispositive. They reflect the parties' express agreement that authority, once delegated in writing by the Manager, is conclusive and not subject to collateral attack based on internal governance disputes.

Delaware law enforces such contractual allocations of authority and risk. Courts applying Delaware contract principles do not permit a party to rely on an agreement as the source of authority while simultaneously attempting to avoid the binding effect of provisions that validate actions taken pursuant to that authority. See InterGen N.V. v. Grina (party may not "enjoy[] rights and benefits under a contract while at the same time avoiding its burdens and obligations"); see also Machado v. System4 LLC (claims intertwined with an agreement cannot be pursued while avoiding its terms). Where, as here, the Agreement expressly authorizes delegation and provides that acts of the delegee are binding and conclusive, those provisions must be given effect.

Accordingly, to the extent the Manager executed a written delegation of authority pursuant to § 1(g), that delegation is valid, enforceable, and sufficient to authorize

the delegee to act on behalf of the Company. Any action taken pursuant to such delegation constitutes the act of the Company itself and is binding without the need for additional approval, ratification, or joinder. Under the plain terms of the Agreement, and consistent with Delaware law, the authority of a duly authorized delegee cannot be disregarded or second-guessed by reference to internal governance disputes that the Agreement itself forecloses.

## VIII. DECLARATORY RELIEF IS APPROPRIATE

This dispute presents a textbook basis for declaratory relief. It requires interpretation and enforcement of a governing LLC agreement, involves a concrete and ongoing controversy regarding managerial authority, and its resolution will definitively clarify the legal rights and obligations of the parties. Delaware courts routinely resolve precisely this type of dispute through declaratory actions addressing control and authority under an LLC agreement.

As recognized in Gurney-Goldman v. Goldman, actions concerning the identity and authority of managers fall squarely within the core function of declaratory judgment, particularly where the dispute turns on the application of contractual governance provisions. Similarly, proceedings under 6 Del. C. § 18-110 are designed to provide a streamlined mechanism for determining who validly holds managerial authority, precisely to eliminate uncertainty that would otherwise impair the entity's operations and the validity of its acts. See Llamas v. Titus (purpose is to "expeditiously resolve uncertainty" regarding managerial control).

That same need for clarity exists here. The question of who holds authority under the Agreement is not hypothetical; it bears directly on the validity of past actions, the scope of delegated authority, and the proper interpretation of the parties' rights under the governing contract. Without a declaratory determination, those issues will continue to be litigated piecemeal across multiple proceedings, creating inefficiency and risk of inconsistent outcomes.

Declaratory relief is therefore not only appropriate—it is necessary to resolve a central, contract-based dispute that has remained outstanding despite extensive litigation in related proceedings.

## IX. THE ISSUE IS NOW RIPE AND NO LONGER PREMATURE

The Court previously stayed this adversary proceeding on the ground that the issue of managerial authority overlapped with the claim allowance process and could be addressed in that context. That rationale no longer applies.

The claim objection process has concluded and resulted in a summary judgment ruling that is now the subject of multiple pending appeals, including an appeal on the merits and a separate appeal challenging the denial of discovery. Those proceedings did not resolve the question of managerial authority under the LLC Agreement. Instead, they proceeded on a contested and, as Plaintiff contends, materially incomplete evidentiary record. As a result, the very process that was intended to

promote judicial economy has not produced a definitive resolution of the contractual issue presented here.

At the same time, this adversary proceeding—filed specifically to obtain a declaratory determination of managerial authority—has remained stayed for more than two years. That delay stands in direct tension with the governing legal framework. Delaware law emphasizes that disputes concerning the identity and authority of a manager should be resolved promptly to eliminate uncertainty and ensure clarity in governance. See Llamas v. Titus; Choice Hotels International, Inc. v. Columbus-Hunt Park DR BNK Investors, L.L.C.

The issue is now fully ripe. The Agreement is before the Court, the relevant provisions are unambiguous, and the question presented is one of contract interpretation and enforcement. Moreover, the determination of managerial authority bears directly on multiple ongoing and potential disputes, including the validity of prior actions, the scope of delegated authority, and the proper allocation of rights within the Company.

In these circumstances, continued deferral is no longer justified. The issue is now ripe, necessary, and appropriate for immediate adjudication.

## X. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court:

1. Grant expedited determination of this motion;

2. Lift or modify the stay to permit adjudication of Count I of the Complaint;

3. Enter a declaratory judgment determining that:

(a) Babcock & Brown Administrative Services Inc. remains the Manager of

Westborough SPE LLC pursuant to § 1(d) of the LLC Agreement;

(b) No valid resignation occurred because the required Member Consent was

never obtained;

(c) No valid replacement, substitution, or transfer of managerial authority

occurred because the Agreement's express requirements were not satisfied;

and

(d) Any purported actions inconsistent with the LLC Agreement's governance

provisions, including its requirements for Member Consent and written

amendment, are invalid and without legal effect; and

4. Grant such other and further relief as the Court deems just and proper.

DATED: April 21, 2026,  Respectfully submitted:



Lolonyon Akouete
800 Red Mills Rd
Wallkill NY 12589
(443) 447-3276
info@smartinvestorsllc.com

# Exhibit A
## Westborough SPE LLC Operating Agreement

WESTBOROUGH SPE LLC

LIMITED LIABILITY COMPANY AGREEMENT

October 22, 1997

GS2- 136229-1

# LIMITED LIABILITY COMPANY AGREEMENT

## TABLE OF CONTENTS

RECITALS                                                                    1

FORMATION, MANAGEMENT, PURPOSES, NAME                                       1

CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS; AND LIABILITY OF
MEMBERS                                                                     6

RETURN OF CONTRIBUTIONS                                                     7

SHARE OF DISTRIBUTIONS, PROFITS, LOSSES AND OTHER ITEMS                     7

SUBSTITUTION AND ASSIGNMENT OF A MEMBER'S INTEREST                          9

BOOKS AND RECORDS; BANK ACCOUNTS                                            9

OTHER BUSINESS                                                             10

DISSOLUTION AND CONTINUATION OF THE COMPANY                                10

MISCELLANEOUS                                                             11

-i-

GS2- 1362291

WESTBOROUGH SPE LLC

LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement (the "Agreement"), dated as of the 22nd day of October, 1997, is by and between MIGNONETTE INVESTMENTS LIMITED, a British Virgin Islands entity organized under the BVI International Business Companies Act (the "Member"), and BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC., a Delaware corporation, as the Manager.

RECITALS:

A.      The Member formed a limited liability company (the "Company") pursuant to and in accordance with the Delaware Limited Liability Company Act (the "LLC Act") by the filing on the date hereof of a Certificate of Formation with the Secretary of State of the State of Delaware for the purposes described therein and herein.

B.      The Member and Babcock & Brown Administrative Services, Inc. desire to enter into this Agreement to provide for, among other things, the management of the business and affairs of the Company, the distribution of monies and allocation of profits and losses as to the Member, and the respective rights, interests, obligations and duties of the Member and of the Manager to each other and to the Company and its assets, business, liabilities and obligations.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, the parties hereto hereby agree as follows:

OPERATING AGREEMENT

1.      Formation. Management. Purposes. Name

(a)      The rights and liabilities of the parties hereto shall be determined pursuant to the LLC Act and this Agreement. To the extent that the rights or obligations of the parties are different by reason of any provision of this Agreement than they would be in the absence of any such provision, or even if this Agreement is inconsistent with the LLC Act, this Agreement shall control, except to the extent the LLC Act provides that the applicable provisions thereof as to any

-1-

Case 24-04011 Doc 56 Filed 04/21/26 Entered 04/21/26 17:01:13 Desc Main Document Page 23 of 39

such matter may not be modified by a limited liability company's members, or unless so modified as provided in this Agreement, in which event the provisions hereof shall be applicable to the extent, if any, permitted by the LLC Act.

The name of the Member and its address are set forth on Schedule A attached hereto. If any additional Members and/or substitute Members are hereinafter added as Members in the Company their names and respective addresses shall be added by amendment of said Schedule A.

The registered office and the registered agent of the Company in the State of Delaware shall be as set forth in the Certificate, as such office and agent may be changed, and as the Certificate may, as a consequence thereof, be amended from time to time by the Manager.

(b) The name of the limited liability company formed hereby is Westborough SPE LLC. The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Manager deems appropriate or advisable. The Manager shall file, or shall cause to be filed, the Certificate of Formation and any fictitious name certificates, foreign state registrations and similar filings, and any amendments to any thereof, that the Manager considers necessary, appropriate or advisable, including, without limitation, an Application for Registration as a foreign limited liability company in the Commonwealth of Massachusetts.

(c) The Company is formed for the sole purpose of, and the nature of the sole business to be conducted by the Company is, to acquire, own, construct, lease, operate, maintain and, consistent with its investment purposes, to sell, exchange, convey and otherwise transfer, and otherwise to deal with, in any manner deemed desirable, the real property generally described in Schedule C attached hereto, and any other real property and any personal property, tangible or intangible, appurtenant to any thereof or hereafter acquired as necessary or convenient in connection with such real property, and to own interests in and be a member and/or manager, partner, general or limited, venturer, stockholder or other holder of interests in any entity holding direct or indirect interests in any such assets or engaged in any such activity, and in connection with all of the above, the Company may engage in any lawful act or activity for which limited liability companies may be formed under the LLC Act and in any and all activities necessary, advisable, convenient or incidental thereto. The purposes of the Company may not be broadened without the unanimous consent of all the Members and the Manager, nor may it be broadened if such would violate or cause a default under any agreement to which the Company is a party or by which it is bound.

GS2- 136229-1

In furtherance of the conduct of the purposes described above, the Company shall have the power and authority to do any and all lawful activities, business or actions which an Company may take under the LLC Act and, except as limited by the LLC Act, any activities, business or actions which a business corporation or a limited partnership would be entitled to engage in or take pursuant to the applicable laws of the State of Delaware, or under other applicable law, so long as such powers are necessary or convenient to the conduct, promotion or attainment of the business, trade, purposes or activities of the Company.

       (d)    Babcock & Brown Administrative Services Inc. is hereby designated as the Manager of the Company. One or more Managers may be designated and the number of Managers may be determined at any time by "Consent of the Members"; provided, however, that any such Consent providing for the Company to have more than one Manager shall only be made by amendment of this Agreement and shall also indicate those circumstances in which each Manager will be authorized to act alone and those circumstances in which more than one or all of the Managers will be required to act on behalf of the Company. A Manager may be removed by Consent of the Members at any time and for any reason or for no reason.

       (e)    Except as otherwise specifically provided in this Section 1 and in Section 8 of this Agreement: (i) the overall management and control of the business and affairs of the Company, and the sole and exclusive authority to make all decisions and take all actions as to the business and affairs of the Company, shall be vested in the Manager, who shall have the sole power and authority to make any decision and to take any action and to exercise any power on behalf of the Company which the Company has the right, power and authority to take or otherwise engage in; and (ii) the Members shall have no voting rights, consent or approval over or as to any such matters.

       Notwithstanding the above, the Manager may not file, on behalf of the Company, a petition in bankruptcy or for reorganization or insolvency or any other similar matter without the unanimous consent of the Members.

       The Manager shall devote, and shall cause its members, partners, officers, directors and employees, if any, to devote such time to the affairs of the Company as such Manager, in its sole discretion, determines is necessary for performance by the Manager of its duties, provided no such persons shall be required to devote full time to such affairs. The Manager shall have the right and power to manage, operate, and control the Company, and to do all things and take

GS2- 136229-1

all actions as it deems necessary or appropriate to carry on the business and affairs of the Company.

Case 24-C40110 Doc 56 Filed 04/21/26 Entered 04/21/26 17:01:13 Desc Main
Document Page 25 of 39

"Consent of the Members" shall mean action of the holders of more than two-thirds of the Percentage Interests of all the Members, as such Percentage Interests are initially set forth on Schedule A hereto and as such Percentage Interests may be changed pursuant to the other provisions of this Agreement.

No Manager may resign or retire from, abandon or otherwise terminate its status as a Manager without the Consent of the Members.

(f)     No Member, acting in its capacity as a Member (but nothing herein limiting any Member's capacity as a Manager if a Member is also a Manager), shall have any authority, power or privilege to act on behalf of or to bind the Company.

(g)     The signature of the Manager or, if more than one Manager any time, of any Manager on any agreement, contract, instrument or other document shall be sufficient to bind the Company and any other Manager in respect thereof, shall be deemed the action of the Company and of any other Manager, and shall conclusively evidence the authority of such executing Manager and the Company with respect thereto, and no third party need look to any other evidence or require joinder or consent of any other party to bind the Company or to evidence such Manager's authority.

Without in any way amending, modifying, expanding or limiting the foregoing provisions of this paragraph (g), an individual or individuals may be authorized in writing by the Manager to execute any documents to be filed with the Secretary of State of the Commonwealth of Massachusetts and/or authorized to execute, acknowledge, deliver and record any recordable instruments on behalf of the Company purporting to effect an interest in real property, whether to be recorded with the registry of deeds or district office of the Land Court, and in the event of any such authorization the Application for Registration for the Company in the Commonwealth of Massachusetts shall include or, as appropriate, be amended to set forth such authorization.

Any Manager may, from time to time, by an instrument in writing, delegate all or any of its powers or duties hereunder to another Manager, if any, or to an officer, manager, member, or partner of any other Manager or to any Member or any other person or entity. Such writing may fully authorize such other Manager or such other person or entity, acting alone or with others, all as

-4-

GS2- 136229-1

may be provided in such written delegation, without requirement of any other evidence of the delegating Manager to take any action of any type and to do anything and everything which the delegating Manager may be authorized to take or do hereunder (including, without limitation, executing checks, drafts, promissory notes, mortgages, deeds of trust, leases, deeds, easements, and contracts of any nature whatsoever) and may delegate such authority generally or as to any specified matter or specific terms, all as may be provided in writing by any such Manager. Any documents or other instruments executed by any person or entity to whom any such delegation has been made shall be binding upon and enforceable against the Company, and shall be the valid act and deed of the Company, if executed by such delegee, and any third party shall be fully protected in relying upon the authority of any such delegee pursuant to a written delegation by the (or a) Manager.

(h)     The Manager shall be entitled to reimbursement from the Company for all expenses incurred by such Manager in managing and conducting the business and affairs of the Company. The Manager shall determine which expenses, if any, are allocable to the Company in a manner which is fair and reasonable to the Manager(s) and the Company, and if such allocation is made in good faith it shall be conclusive in the absence of manifest error.

(i)     Any Manager, or the sole Manager if there is only one, may cause the Company to enter into one or more loans, agreements, leases, contracts or other arrangements for the furnishing to or by the Company of money, goods, services or space with any Member, Manager or an affiliate thereof, and may pay compensation thereunder for such goods, services or space, provided in each case the terms of any such arrangements are at least as advantageous to the Company as those which would be available to the Company under similar arrangements between unrelated parties, and if the determination of such terms is made in good faith it shall be conclusive in the absence of manifest error.

(j)     In the performance of its duties and obligations hereunder, and in the exercise of its powers hereunder, the Manager shall act in good faith. The Company shall indemnify, defend and hold harmless the Manager, each Member, any person appointed to act for or on behalf of the Company pursuant to Section 1(g), and each such person's officers, directors, partners, members, shareholders, employees, and agents, and the employees, officers and agents of the Company (all indemnified persons being referred to as "Indemnified Persons" for purposes of this Section 1(j)), from any liability, loss, or damage incurred by an Indemnified Person by reason of any act performed or omitted to be performed by such Indemnified Person in connection with the business of the Company, and

-5-

GS2- 136229-1

from liabilities or obligations of the Company imposed on such person by virtue of such person's position with or relationship to the Company, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss, or damage; provided, however, that, if the liability, loss, damage, or claim arises out of any action or inaction of an Indemnified Person, indemnification under this Section 1(j) shall be available only if (i) the Indemnified Person, at the time of such action or inaction, determined, in good faith, that its course of conduct was consistent with this Agreement or otherwise in the best interests of the Company, and (ii) the action or inaction did not constitute fraud, gross negligence or willful misconduct by the Indemnified Person. Any indemnification under this Section 1(j) shall be recoverable only from the assets of the Company and not from any assets of any of the Members.

2.    Capital Contributions; Capital Accounts; and Liability of Members.

(a)    The Member has contributed in cash to the capital of the Company the amount set forth opposite such Member's name on Schedule B hereto.

Additional capital contributions may be made (but are not required to be made) by the Member, or any of them if more than one, if necessary or desirable to enable the Company to meet its obligations.

Any third party may rely on a certificate or other statement from the Manager as to Member or Members of the Company and the respective Percentage Interests of the Members at any time. All capital contributions by the Member(s) shall be reflected on the books and records of the Company.

Upon approval of the Manager, any Member may make a loan or loans to the Company on such terms as the Manager may determine. No such loan shall be considered a contribution to the capital of the Company.

(b)    No Member shall be obligated to contribute any additional capital or make any loans to the Company. No interest or preferred return shall accrue on any contributions to the capital of the Company. No Member shall have any rights or priority over any other Members as to contributions or as to distributions or compensation by way of income, except as may otherwise be specifically provided for elsewhere in this Agreement.

(c)    If there is more than one Member at any time and the Company has not elected to be taxed as a corporation under the Internal Revenue Code, a separate capital account ("Capital Account") shall be established for each Member,

GS2- 136229-1

and shall be maintained in accordance with applicable regulations under the Internal Revenue Code of 1986, as amended (the "Code"), to the extent consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital made by such Member to the Company, and such Member's share of the net profits, and items thereof, of the Company, and there shall be charged against each Member's Capital Account the amount of all distributions to such Members, and such Member's share of the net losses, and items thereof, of the Company.

(d)     The liability of any Member for the losses, debts and obligations of the Company shall be limited to its capital contributions then made but not then previously repaid to or withdrawn by them in accordance with the terms of this Agreement.  No Member, in its capacity as a Member or as Manager, shall have any liability to restore any negative balance in its Capital Account.  In no event shall any Member, in its capacity as a Member, nor any Manager, whether or not also a Member, be personally liable for any judgments, debts, liabilities or obligations of the Company.

(e)     The Member(s), unanimously if more than one, shall have the right at any time to require the Manager to elect to treat the Company as a corporation under the Internal Revenue Code.

3.     <u>Return of Contributions</u>.  No Member shall have the right to withdraw or to be repaid any capital contributed by it or to receive any property or other payment in respect of its interest in the Company, including, without limitation, as a result of the withdrawal or resignation of such Member from the Company, except as specifically provided in this Agreement.

4.     <u>Share of Distributions, Profits, Losses and Other Items</u>.

(a)     All cash available for distribution shall be distributed to the Member, or among the Members if there is more than one Member, first to return any unrepaid capital contributions, pro-rata among the Members with such amounts in proportion to each respective Member's unrepaid capital contribution, and then among the Members according to their respective Percentage Interests. Distributions to the Members shall be made at such times and in such amounts as shall be reasonably determined by the Manager.  Except as provided in the next paragraph, all distributions to Members shall be made in cash.

If the Manager elects, with the Consent of the Members, to distribute any assets of the Company in kind, such assets shall be distributed on the basis of

-7-

GS2- 136229-1

their fair market value as determined by the Manager, and if the determination of
such fair market value is made in good faith it shall be conclusive in the absence of
manifest error.

Case 24-04017   Doc 56   Filed 04/20/26   Entered 04/21/26 17:01:13   Desc Main
Document     Page 29 of 39

(b)    If and so long as the Company is taxed as a partnership, allocations of income, profit, gain and loss, shall be made as follows:  (i) items of net income and gain shall be allocated among the Members in the manner necessary to increase each Member's Capital Account to an amount equal to the amount of cash such Member would be entitled to receive pursuant to Section 4(a) if an amount of cash equal to the net positive Capital Account balances (after such allocation) were distributed to the Members in the order and priority specified in Section 4(a), and (ii) items of net loss and deduction shall be allocated among the Members in the manner necessary to reduce each Member's Capital Account to an amount equal to the amount of cash such Member would be entitled to receive pursuant to Section 4(a) if an amount of cash equal to the net positive Capital Account balances (after such allocation) were distributed to the Members in the order and priority specified in Section 4(a).

Notwithstanding the foregoing, all allocations of items that cannot have economic effect (except "partner nonrecourse deductions") shall be allocated to the Members in accordance with the Members' interests in the Company, which, unless otherwise required by Code Section 704(b) and the Regulations promulgated thereunder, shall be in proportion to the Percentage Interests of the Members, and all "partner nonrecourse deductions" and "partner minimum gain" shall be allocated in accordance with the provisions of Treasury Regulations Section 1.704-2.

All items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, shall be allocated to and among the Members in the same percentages in which the Members share in net profits and net losses.

(c)    Except as otherwise specifically provided herein, all tax elections shall be made by the Manager as it shall deem appropriate.

5.    <u>Substitution and Assignment of a Member's Interest</u>.  A Member may sell, assign, give, pledge, hypothecate, encumber or otherwise transfer (including, without limitation, any assignment or transfer by operation of law or by order of court) all or any part of such Member's interest in the Company, without the consent or approval of any other Member or of the Manager.

GS2- 136229-1

6. Books and Records; Bank Accounts.

(a) The Manager shall keep or cause to be kept complete and accurate books and records of the Company using such method as the Manager may elect. Such books and records shall be maintained and be available, in addition to any documents and information required to be furnished to the Members under the LLC Act, at an office of the Company for examination and copying by any Member, or its duly authorized representative, at its reasonable request and at its expense during ordinary business hours. Any Member may, at any time, at its own expense, cause an audit or review of the Company books to be made by a certified public accountant of its own selection.

A current list of the full name and last known address of each Member and of the Manager, a copy of this Agreement, any amendments thereto and the Certificate of Formation, executed copies of all powers of attorney, if any, pursuant to which this Agreement, any amendment, or the Certificate of Formation has been executed, copies of the Company's financial statements and federal, state and local income tax returns and reports, if any, for the five most recent years, shall be maintained at the registered office of the Company required by the LLC Act.

If the Company is taxed as a partnership, then on or before the due date (including extensions) of the federal income tax return of the Company for each fiscal year of the Company, the Manager shall cause each Member to be furnished with copies of the Company's federal income tax return and Schedule K-1's for each respective Member for the fiscal year then ended.

If the Company is taxed as a corporation, the Manager shall timely (including extensions) file all requisite federal, state and local tax returns.

(b) Bank accounts and/or other accounts of the Company shall be maintained in such banking and/or other financial institution(s) as shall be selected by the Manager, and withdrawals shall be made and other activity conducted on such signature or signatures as shall be designated by the Manager.

(c) The fiscal year of the Company shall end on December 31 of each year.

7. Other Business. The Members, the Manager and any affiliates of any of them may engage in and possess interests in other business ventures and

-9-

GS2- 136229-1

investment opportunities of every kind and description, independently or with others, including serving as managers and general partners of other limited liability companies and partnerships with purposes similar to those of, and/or in competition with, the Company. Neither the Company nor any other Member or Manager shall have any rights in or to such ventures or opportunities or the income or profits therefrom.

8.      Dissolution and Continuation of the Company.

(a)      The Company shall be dissolved and its affairs wound up upon:

(i) The election, made in writing by the Manager, with the Consent of the Members, to dissolve the Company at any time which is 90 days or more after notice of such election to all Members;

(ii) The sale, disposition or abandonment of all or substantially all of the assets of the Company; or

(iii) The entry of a decree of judicial dissolution under the LLC Act.

The Company shall have no specific date of dissolution.

(b)      Upon the dissolution of the Company for any reason, the Manager shall commence to wind up the affairs of the Company and to liquidate its assets. After the sale or other disposition of all of the assets of the Company to be disposed of in the liquidation, and gains and losses thereon shall be calculated. If the Company is taxed as a partnership, such gains and losses shall be allocated in the manner described in Section 4 hereof, and applied to the Capital Accounts of each Member to whom the allocations are made pursuant to the other provisions hereof.

(c)      Following the payment of all debts and liabilities of the Company to persons other than the Members and the payment of all expenses of liquidation, and subject to the reserves which the Manager, or other liquidating party, may determine is reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds shall be applied to the payment of any debts and liabilities to the Members, if any, and then shall be distributed to the Member(s) (i) in accordance with Section 4(a)

-10-

GS2- 136229-1

if the Company is taxed as a corporation, and (ii) in accordance with each Member's respective Capital Account(s) as of the date of such distribution, after giving effect to all contributions, distributions, and allocations for all periods, if the Company is taxed as a partnership.

(d)     The assets of the Company shall be a Member's source of all distributions with respect to the Company, the return of its capital contributions thereto and its share of profits and losses thereof, and each such Member shall have no recourse therefor (upon dissolution or otherwise) against any other Members.

(e)     Upon the completion of the liquidation of the Company and the distribution of all Company's funds, the Company shall terminate, and the Manager shall, or if none, the Members may authorize one or more Members to, execute and record such articles of dissolution for the Company and any and all other documents necessary to effectuate the dissolution and termination of the Company.

9.     Miscellaneous.

(a)     Subject to the restrictions on transfers set forth herein, the terms of this Agreement shall be binding upon and shall inure to the benefit of the Members and the Manager, their respective permitted successors, successors-in-title, heirs and assigns; and each and every successor-in-interest to any Member, whether such successor acquires such interest by way of inheritance, gift, purchase, foreclosure or any other method, and the Members shall hold such interest subject to all of the terms and provisions of this Agreement. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of any Member (including any Member acting in his capacity as a creditor of the Company).

(b)     No change, modification or amendment of this Agreement shall be valid or binding unless such change, modification or amendment shall be in writing and duly executed by all of the Members and, if (but only if) such affects the rights or obligations of the Manager, executed by the Manager.

(c)     This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware, notwithstanding any choice of law rules to the contrary.

GS2- 136229-1

(d)     This Agreement may be executed in any number of counterparts, all of which together shall for all purposes constitute one Agreement, binding on all the Members and the Manager notwithstanding that all Members and the Manager have not signed the same counterpart.

(e)     Any and all notices under this Agreement shall be effective (i) on the fourth business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (ii) on the second business day after being sent by express mail, telecopy, or commercial expedited delivery service providing a receipt for delivery.  All such notices in order to be effective shall be addressed, if to the Company at its registered office under the LLC Act, if to a Member at the last address of record on the Company books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.

(f)     As used herein, the singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.  The word "person shall mean a natural person, a trust of any nature, or any incorporated or unincorporated entity or association of any type or form.

(g)     If any provisions of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it si held invalid, shall not be affected hereby.

(h)     Words such as "herein", "hereinafter", "hereof", "hereto", "hereby", and "hereunder", when used in reference to the Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(i)     This Agreement, including the Certificate of Formation, which is hereby incorporated herein, embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

IN WITNESS WHEREOF, the Members have executed this Limited Liability Company Agreement of Westborough SPE LLC as of the date first above written.

MEMBER:

MIGNONETTE INVESTMENTS LIMITED

By: _____
       Authorized Signatory

MANAGER:

BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

By: _____
Its _____

-13-

GS2- 136229-1

IN WITNESS WHEREOF, the Members have executed this Limited Liability Company Agreement of Westborough SPE LLC as of the date first above written.

MEMBER:

MIGNONETTE INVESTMENTS LIMITED

By: _____
    Authorized Signatory

    For F.M.C. LIMITED
    CORPORATE DIRECTORS

MANAGER:

BABCOCK & BROWN ADMINISTRATIVE SERVICES, INC.

By: _____

    Its _____

-13-

SCHEDULE A
TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
WESTBOROUGH SPE LLC

## MEMBER

| NAME AND ADDRESSES OF MEMBER | PERCENTAGE INTEREST |
| --- | --- |
| Mignonette Investments Limited | 100% |

-A-1-

GS2- 1362291

SCHEDULE B
TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
WESTBOROUGH SPE LLC

MEMBER

| MEMBER | INITIAL CASH CAPITAL CONTRIBUTION |
|---|---|
| Mignonette Investments Limited | $10,000 |

-B-1-

GS2- 1362291

-C-1-

SCHEDULE C
TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
WESTBOROUGH SPE LLC

PROPERTY DESCRIPTION

-C-1-

GS2- 1362291

CERTIFICATE OF SERVICE

I, Lolonyon Akouete, hereby certify that the above document is served by email and mailing a copy of the same, first-class mail, to the following:

Stephen F. Gordon, Attorney of the Petitioners
(Email: sgordon@gordonfirm.com)
The Gordon Law Firm LLP
River Place 57 River Street Wellesley, MA 02481

Scott A. Schlager on behalf of,
Nathanson & Goldberg, P.C., a creditor.
(Email: sas@natgolaw.com)
183 State Street, 5th Floor Boston, MA 02109

Assistant U.S. Trustee
Richard King
Office of US. Trustee
446 Main Street 14th Floor
Worcester, MA 01608
USTPRegion01.WO.ECF@USDOJ.GOV

Jonathan R. Goldsmith
Chapter 7 Trustee
trusteedocs1@gkalawfirm.com
Goldsmith, Katz & Argenio P.C.
1350 Main Street, 15th Floor.
Springfield, MA 01103

Dyann Blaine
20 Queensbrook Place
Orinda, CA 94563
dyann.blaine@gmail.com

Jan Blaustein Scholes
7501 E Thompson Peak Pkwy
Scottsdale, AZ 85255
jan.scholes2@gmail.com

Mark S. Lichtenstein
AKERMAN LLP
1251 Avenue of the Americas, 37th Flr.
New York, New York 10020
mark.lichtenstein@akerman.com

Paul W. Carey, Attorney of Creditor
FERRIS DEVELOPMENT GROUP, LLC
(Email: pcarey@mirickoconnell.com)
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street, Worcester, MA 01608

Brian W. Riley, Attorney of Creditor
Jeffrey T. Blake, Attorney of Creditor
Roger L. Smerage, Attorney of Creditor
TOWN OF WESTBOROUGH
(Email: briley@k-plaw.com)
(Email: jblake@k-plaw.com)
(Email: rsmerage@k-plaw.com)
KP Law, P.C.  101 Arch Street,
12th Floor Boston, MA 02110

Gary M Ronan
David M Abromowitz
Goulston&storrs
GRonan@goulstonstorrs.com
DAbromowitz@goulstonstorrs.com
400 Atlantic Avenue
Boston, MA 02110

Peter Blaustein
950 Vista Road
Hillsborough, CA 94010
pblaustein@gmail.com

Walter Horst
Babcock & Brown
1264 Rimer Drive
Moraga, CA 94556
walter.horst@babcockbrown.com

Samual A. Miller, Esq.
AKERMAN LLP
420 South Orange Avenue
Suite 1200
Orlando, FL 32801
samual.miller@akerman.com
sharlene.harrison-carera@akerman.com

___ _____

Lolonyon Y Akouete